Jennifer Marie Cabrera (NY 4534939)
*Pro Hac Vice*
E-mail: Jennifer@dantanlaw.com
Dan Tan Law
1133 Broadway, Suite 708
New York, NY 10010
Tel: 646-580-0080 Fax: 212-330-7642

Douglas W. Dal Cielo (SBN 157109)
E-mail: ddalcielo@bwslaw.com
Brian M. Affrunti (SBN 227072)
E-mail: baffrunti@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
2440 West El Camino Real, Suite 620
Mountain View, CA 94040-1499
Tel: 650.327.2672 Fax: 650.688.8333

Attorneys for Defendant
Dr. Hamid Najafi

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| INJAZAT TECHNOLOGY FUND B.S.C.,<br><br>Plaintiff,<br><br>v.<br><br>DR. HAMID NAJAFI AND MICHAEL CUMMISKEY,<br><br>Defendants. | Case No. 4:11-cv-04133 PJH<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STAY CONFIRMATION OF ARBITRATION AWARD**<br><br>Date: March 30, 2012<br>Time: TBA<br>Judge: Hon. Phyllis J. Hamilton |

## TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1
II. FACTUAL BACKGROUND .......... 2
A. Parties to the Broadlink Contracts .......... 2
B. The Broadlink I Arbitration .......... 4
C. An Award is Issued and the Travel Ban is Imposed .......... 5
D. The Broadlink II ICC Arbitration .......... 6
III. LEGAL ARGUMENT .......... 8
A. This action should be stayed pending resolution of Broadlink II .......... 8
1. District Courts Have Inherent Power To Stay Confirmation of Arbitration Awards Pending the Completion of Related Proceedings .......... 8
2. Stay of Confirmation Is Appropriate Here Because the Award is not Complete Pending Resolution of Broadlink II .......... 10
IV. CONCLUSION .......... 14

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Adobe Sys. v. Hoops Enter. LLC,* 2012 U.S. Dist. LEXIS 34551 (N.D. Cal. March 14, 2012) ........................................10

*Alliance for the Wild Rockies v. Cottrell,* 622 F.3d 1045 (9th Cir. 2010)........................................10

*Cal. Pharmacists Ass'n v. Maxwell-Jolly,* 596 F.3d 1098 (9th Cir. 2010) ........................................13

*Fertilizer Corp. of India v. IDI Mgmt., Inc.*, 517 F. Supp. 948 (S.D. Ohio 1981) ..................... 9

*Hewlett-Packard Co., Inc. v. Berg,* 61 F.3d 101 (1st Cir. 1995) ..............................8, 9, 10, 11

*Higgins v. SPX Corp.*, 2006 U.S. Dist. LEXIS 20771 (W.D. Mich. Apr. 18, 2006)................. 9

*Korea Wheel Corp. v. JCA Corp.*, 2005 U.S. Dist. LEXIS 40374 (W.D. Wash. Dec. 16, 2005). ........................................9, 12

*Landis v. North Amer. Co.*, 299 U.S. 248, (1936) ........................................8, 10

*Middleby Corp. v. Hussmann Corp., 1991 U.S. Dist. LEXIS 8727 (N.D. Ill. June 26, 1991)*........................................ 9

*Ministry of Def. & Support v. Cubic Def. Sys., 665 F.3d 1091 (9th Cir. 2011)*........................10

*Nken v. Holder, 556 U.S. 418, 129 S. Ct. 1749 (2009)*........................................10

*OBG Ltd. v. Allan* [2008] 1 AC 1........................................11

*Europcar Italia S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310 (2d Cir. 1998) ......................... 9

*Spier v. Calzaturificio Tecnica, S.p.A.*, 663 F. Supp. 871 (S.D.N.Y. 1987) ............................ 9

*Supershield Ltd v Siemens Building Technologies FE Ltd* [2010] EWCA Civ 7 ....................11

*Swindle and others v Harrison and another*, [1997] 4 All ER 705 ........................................11

## I. INTRODUCTION

This Court should stay confirmation of the award sought by Injazat as enforcement now would be premature since a related arbitration between these two parties is pending. Immediately following an arbitration award issued on July 25, 2011 ("Broadlink I"), Injazat abusively secured a travel ban from the Dubai courts effectively holding Dr. Najafi prisoner in that country for five months. During this period, Injazat attempted to use this leverage to coerce Dr. Najafi into a sizeable financial settlement quite apart from the existing award. Having finally won reprieve from this travel ban in January, Dr. Najafi is now in a position to properly pursue his own claims against Injazat via a separate arbitration ("Broadlink II"). As explained below, this Court should stay enforcement of the award under Broadlink I until Broadlink II – which will determine the value of Dr. Najafi's offsetting claims against Injazat – is concluded.

A district court has inherent authority to stay a proceeding pending the resolution of a related proceeding where it would be prudent and avoid inconsistency. *See* section III.A.i. A stay would be entirely appropriate in this case – and is, in fact, necessary – in order to avoid duplicative judicial review of two linked arbitration awards between identical parties. Furthermore, such a stay will not harm Injazat; whereas enforcement now will seriously harm Dr. Najafi. Because Injazat is winding up and transferring its assets to a successor fund, Dr. Najafi almost certainly will be unable to collect his award under Broadlink II. However, if a stay is granted, Dr. Najafi can at least deduct the amount of Injazat's award under Broadlink I from his own award under Broadlink II. In contrast, Injazat does not risk any harm if a stay is granted, except that it will not receive a premature judgment awarding Injazat more money that it will be entitled to once the Broadlink II arbitration is complete.

Dr. Najafi does not raise any grounds against the recognition of the Broadlink I award under the New York Convention. Instead, it is his position that it would be premature to confirm the award of $3,426,552.45 in favor of Injazat before an award is issued in Broadlink II determining the amount of setoff to which Dr. Najafi is entitled.

## II. FACTUAL BACKGROUND

### A. Parties to the Broadlink Contracts

The parties to this action include:

1. Injazat Technology Fund B.S.C. ("Injazat"), a Bahraini fixed term venture capital fund with its principal place of business in Dubai, and former owner of 35% of the shares of Broadlink Research FZ LLC. Injazat is established and managed by G Capital, formerly known as Injazat Capital. According to G Capital's website, Injazat will be closed and ITF II is being launched as its successor. *See* Decl. of H. Najafi at para. 23.

2. Dr. Hamid Najafi, an American engineer with 25 years of experience in the wireless industry, and former President and CEO of Broadlink Research FZ LLC.

3. Mr. Michael Cummiskey, an American businessman with nearly 30 years of experience in the wireless industry and former Vice President at Broadlink Research FZ LLC, who has been terminated from this action.

Non-party Broadlink Research FZ LLC ("Broadlink") is a company incorporated in Dubai Silicon Oasis, United Arab Emirates, which was established by the parties in June 2006 to design, manufacture and market wireless products.

Dr. Najafi and Mr. Cummiskey first developed the idea of designing, manufacturing, and marketing a Disney-branded mobile phone in 2004. The telephone would be marketed to children and featured a simplified interface and special safety features like a low radiation antenna and exchangeable keypads. *See* Najafi Decl. Ex. A. at para. 23.

Injazat and Dr. Najafi first began discussing a joint investment in a wireless start-up in July 2005. Injazat negotiated with Dr. Najafi and Mr. Cummiskey for over a year before agreeing that Injazat would invest $3 million in Broadlink in return for a 35% ownership stake. *See* Najafi Decl. Ex. A at paras. 25-36. Injazat conducted nearly a year of due diligence before the parties signed,[1] on September 22, 2006, two agreements that had been

---

[1] While Dr. Najafi signed both agreements on behalf of Broadlink, Injazat did not sign either agreement.

drafted by Injazat's lawyers: a Share Subscription Agreement ("SSA") (*see* Ex. A to Dharwarkar Decl. ISO Pet. to Confirm Arb. Award, *hereinafter* "Dharwarkar Decl.") and a Shareholders Agreement ("SHA") (Dharwarkar Decl. Ex. B). Both agreements were made "by and among":

a. Dr. Najafi and Mr. Cummiskey as "Guarantors,"[2] "each of whom is individually a Party to this Agreement, in their capacity as the shareholders of Domela Investment Limited, the current sole shareholder of the Company";

b. Injazat, "represented by its duly authorized signatories"; and

c. Broadlink, "hereby represented by its duly authorized signatories."

Clause 3.1 of the SSA governs Injazat's subscription for 35% of the shares of Broadlink in return for payment of $3 million as follows:

a. An Initial Payment of $1,250,000.00 in the form of a Letter of Credit to be issued by Injazat directly to Disney;

b. A Second Payment of $750,000.00 to be paid by Injazat into the Broadlink bank account; and

c. A Third Payment of $1,000,000.00 to be paid by Injazat into the Broadlink bank account.

In addition to the SSA and the SHA, Broadlink and Injazat entered into a Placement Agency Agreement on July 23, 2006, whereby Injazat promised to assist the company in raising $3 million from outside investors in return for a 14% subscription of the company's total share capital, valued therein at $21.5 million. *See* Najafi Decl. Ex. A at para. 29 (a copy of the Placement Agency Agreement is found at Ex. 1 to the Request for Arbitration).

Yet Injazat never made the final payment of $1 million that was due to Broadlink under the SSA. Nor did it ever raise more than $1 million under the Placement Agency

---

2 The SHA differs in only one respect, referring to Dr. Najafi and Mr. Cummiskey as "Partners" instead of "Guarantors."

Agreement. As a result, Broadlink was constantly strapped for cash and had trouble paying its manufacturers and meeting purchase orders placed by important customers like Vodafone. In 2007, Broadlink also failed to meet the minimum purchase requirements under its licensing agreement with Disney. *See* Najafi Decl. Ex. A at para. 54.

In April 2007, Injazat approached Dr. Najafi with an offer of $750,000 in funding for Broadlink if he agreed to step down as CEO and allow Injazat to name a replacement. Dr. Najafi reluctantly agreed in the interest of solving his company's financial woes, and Injazat hired and appointed Steven Wakefield as his replacement in June 2007. Yet Injazat never paid this $750,000. *See* Najafi Decl. Ex. A at paras. 59-63

By mid-2007, Injazat had failed to advance at least half of the money that it had promised to Broadlink and the company was in a dire financial position. Yet Injazat refused to dilute its share subscription by allowing any other businesses to invest in the company. In fact, Injazat turned down an offer made in May 2007 by BlueNET, a Florida-based company that was interested in purchasing Injazat's entire investment plus 8% profit, and which proposed to assist Broadlink with future funding. *See* Najafi Decl. Ex. A at para. 56.

Instead of seizing the opportunity to exit the company that it was so unwilling to fund, Injazat held on to its position in Broadlink. Around June 2007, Injazat refused to replace two members of the Broadlink Board of Directors who Injazat had appointed and who had resigned unexpectedly. As a result, the Broadlink Board was down to only three members and was unable to make any decisions under the Shareholders Agreement. Finally, in August 2007, Mr. Wakefield, who Injazat had appointed as CEO of Broadlink, recommended to the Broadlink Board that the company be wound up.[3] *See* Najafi Decl. Ex. A at para. 63.

**B. <u>The Broadlink I Arbitration</u>**

Injazat filed a Request for Arbitration with the International Chamber of Commerce ("ICC") Court of Arbitration on October 20, 2008. It did not name as a respondent its counterparty to the SSA and SHA – Broadlink. Instead of naming the company it had

---

[3] Broadlink has not been wound up, and its debts currently exceed its assets, the latter of which primarily consist of unvalued intellectual property rights. *See* Najafi Decl. at para. 66.

bankrupted, Injazat brought the arbitration against Dr. Najafi and Mr. Cummiskey in their individual capacities. During this arbitration, Dr. Najafi was represented by German counsel who was inexperienced in arbitration and in English law. Dr. Najafi did not pursue his own claims, instead objecting to being held personally liable under Broadlink's contracts with Injazat. *See* Decl. of H. Najafi at para. 4.

On January 17, 2010, the sole arbitrator[4] issued a partial award finding that he had jurisdiction over both defendants. A final award (the "Award") was issued by the Arbitrator on July 25, 2011, holding Dr. Najafi and Mr. Cummiskey jointly liable to return to Injazat the value of its initial $2 million investment in Broadlink. With interest, arbitration costs and legal fees, the award totaled $3,426,552.45. *See* Dharwarkar Decl. Ex. D.

**C. <u>An Award is Issued and the Travel Ban is Imposed</u>**

On August 18, 2011, less than a month after the Award was issued, Injazat secured a travel ban from a judge with the Dubai Court of First Instance, preventing Dr. Najafi from leaving the United Arab Emirates. Dr. Najafi was literally trapped in Dubai until January 12, 2012, when, after spending many thousands of dollars in legal fees, Dr. Najafi finally convinced the Dubai court to lift the travel ban, allowing him to leave the country on January 18, 2012 (a mere two days before Magistrate Lloyd issued his order confirming the arbitration award, which was subsequently vacated on March 9, 2012). *See* Decl. of H. Najafi at paras. 6-19.

During the five-month period in which Dr. Najafi could not leave Dubai, Dr. Najafi lost his position with InvenSense because he was unable to meet the job's substantial travel requirements. He was also repeatedly harassed by Injazat representatives and their lawyers at the Dubai office of Dewey LeBoeuf LLP in an attempt to coerce him into signing a financial settlement that would not even have discharged his liability under the Award. In their efforts to coerce Dr. Najafi to sign a financial settlement (which he refused to sign), representatives of Injazat, in particular David Haigh of G Capital and Peter Gray of Dewey LeBoeuf LLP, constantly threatened Dr. Najafi with imprisonment in an Emirati debtors'

---

[4] The parties jointly nominated James Evans as Sole Arbitrator. *See* Dharwarkar Decl. Ex. D.

prison. Dr. Najafi was prevented from returning to the United States for Christmas 2011 to visit his daughters and his elderly parents. He was only able to return to the United States on January 18, 2012. *See* Decl. of H. Najafi at para. 19.

While having Dr. Najafi held against his will in the UAE, Injazat simultaneously brought civil suits in federal courts in the District of Nevada, the Northern District of Georgia and in this Court to confirm the arbitration award and seize any property it can find belonging to Dr. Najafi in the United States. Because he was trapped in Dubai fighting the travel ban, Dr. Najafi was prevented from engaging an attorney to respond to the enforcement action that Injazat was pursuing in this court. He was also unable to file a separate arbitration with the ICC against Injazat based on its breach of the SSA and SHA with Broadlink. *See* Decl. of H. Najafi at paras 20-22. .

**D. <u>The Broadlink II ICC Arbitration</u>**

On March 30, 2012, Dr. Najafi filed a Request for Arbitration with the ICC Court of Arbitration ("Broadlink II") alleging the following claims:

1. <u>Breaches of the SSA and SHA</u>:
    a. Injazat failed to pay $1 million as required by Clause 3.1 of the SSA.
    b. Injazat failed to pursue negotiations with potential investors in violation of the following provisions:
        i. Article 8(a) of the SSA;
        ii. Article 10.1 of the SHA; and
        iii. Part 1, Art. 2 and Part II, Art. 2 of Broadlink's Corporate Governance Manual and Guidelines, incorporated into the SHA as Schedule 3 thereto.
    c. Injazat issued a press release announcing Broadlink's contract with Disney in violation of Clause 13.1 of the SSA.
    d. Injazat failed to replace departing board members, in violation of Article 8(a) of the SSA and the June 4, 2007 Addendum to the

SSA and the SHA.

2. Breach of Oral Contract/Estoppel.

a. Injazat breached its promise to advance $750,000 to Broadlink.

3. Breach of the Placement Agency Agreement.

a. Injazat failed to use its "best efforts" in identifying and negotiating with potential investors under the Placement Agency Agreement.

4. Tortious Interference with Contract.

a. Injazat prevented Broadlink from fulfilling its contractual obligations to Disney, Telian and Vodafone, among others.

5. Tortious Interference with Broadlink's Business Relationships.

a. Injazat prevented Broadlink and Dr. Najafi from developing business relations with potential investors BlueNET, Shelby, Infosonics and NEEI, among others.

6. Breach of Fiduciary Duty

a. Injazat breached the duties it owned as a fiduciary to Broadlink, including its duties of care and loyalty.

7. False Imprisonment.

a. Injazat secured a travel ban against Dr. Najafi through abusive and dishonest means.

*See* Najafi Decl. Ex. A at paras. 72-82.

All except one of these claims relate to the exact same dispute as Broadlink I, namely, the failure and ultimate insolvency of Broadlink in 2007. As related in his Declaration, Dr. Najafi has brought this arbitration at the earliest possible time. *See* Najafi Decl. at para. 22. Dr. Najafi was neither financially nor psychologically able to consider bringing these claims during the five-month period that he was banned from leaving Dubai – a ban that Injazat initiated a mere 24 days after the Award was issued in Broadlink I.

It is only in the two months since the travel ban was lifted that Dr. Najafi has been

able to work with counsel to develop these claims and prepare this filing. Furthermore, Dr. Najafi only returned to work in March 2012, meaning that he is only now financially able to afford the significant fees associated with bringing an ICC arbitration.[5] *See* Decl. of H. Najafi at para. 22.

## III.
## LEGAL ARGUMENT

### A. This action should be stayed pending resolution of Broadlink II

Dr. Najafi requests that these confirmation proceedings be stayed pending the outcome of the Broadlink II arbitration. He does not object to recognition of the Award under the New York Convention or the Federal Arbitration Act; rather he simply asserts that it would be premature to confirm the Award now. Broadlink II, which was filed on March 30, 2012, involves the same parties and the same arbitration agreement and relates to the same dispute as Broadlink I. In other words, the award in Broadlink II will address the very issue of liability that is the subject of the Broadlink I Award that Injazat asks this Court to confirm. To avoid the possibility of inconsistent results and manifest injustice to Dr. Najafi, these proceedings should be stayed under this Court's inherent authority.

#### 1. District Courts Have Inherent Power To Stay Confirmation of Arbitration Awards Pending the Completion of Related Proceedings

This Court has inherent power to stay proceedings where, as here, a related proceeding is pending in another forum that involves the same issues before the Court. *See, e.g., Landis v. North Amer. Co.* 299 U.S. 248, 254 (1936). This traditional authority is not curtailed by the New York Convention, which governs the arbitration award at issue here. *See, e.g., Hewlett-Packard Co., Inc. v. Berg*, 61 F.3d 101, 106 (1st Cir. 1995) (district courts have inherent authority to stay an action to confirm an arbitration award covered by the New York Convention).

In Hewlett-Packard, the First Circuit considered a dispute remarkably similar to the present one. The First Circuit ruled that it was premature to enforce an arbitration award

[5] As described in his Declaration, Dr. Najafi has had to pay a filing fee of $3,000, and will need to pay substantial sums as part of a "Provisional Advance" within the next few months.

when a pending, related arbitration between the same parties might create an offset to the original award. *Hewlett-Packard*, 61 F.3d at 105. Mr. Berg filed a petition with the district court in Massachusetts to confirm an ICC arbitration award against Hewlett-Packard ("HP"). HP asked the court to stay the proceedings and compel arbitration, as a separate ICC arbitration was pending between the same parties involving a related dispute. The First Circuit vacated the district court's order confirming the ICC arbitration award, ruling that the New York Convention does not curtail the traditional authority of courts to defer proceedings during the pendency of a related proceeding in another tribunal, and remanded to allow the district court to consider whether to stay the proceeding pending the ICC arbitration.[6] *Id.* at 105-06.

Following this reasoning, at least one other court has recognized that it is appropriate to stay enforcement if pending arbitration proceedings may create a setoff against the original award. *See Korea Wheel Corp. v. JCA Corp., No. C05-1590C,* 2005 U.S. Dist. LEXIS 40374, *5 (W.D. Wash. Dec. 16, 2005) ("stay of the enforcement action pending resolution of the arbitration of JCA's claim is a cautious and prudent exercise of the Court's inherent power to stay"). *Cf. Middleby Corp. v. Hussmann Corp.* 1991 U.S. Dist. LEXIS 8727, *10-11 (N.D. Ill. June 26, 1991) *aff'd* 962 F.2d 614 (7th Cir. 1992) (postponing entry of judgment on arbitration award pending resolution of claims in a related litigation).[7]

---

[6] While the Court stated that the power to stay should be "cautious[ly] and prudent[ly]" exercised, it wrote: "we think it would require some explanation if, in the face of the equities of this case, the district court concluded that the full award should be confirmed and collected now." *Hewlett-Packard*, 61 F.3d at 106.

[7] The issuance of a stay in this proceeding would also accord with decisions made under Article VI of the New York Convention, which recognizes the right of national courts to adjourn enforcement proceedings in the analogous situation where a legitimate action is pending in foreign courts to set aside the arbitration award. *See e.g., Higgins v. SPX Corp.,* 2006 U.S. Dist. LEXIS 20771, *14 (W.D. Mich. Apr. 18, 2006) ***comity and efficient use of judicial resources does strongly favor staying this action*** to await the decision of the Brazilian courts as to the nullification action. The reasons for doing so--comity, judicial efficiency, and the convenience of the parties and the courts--are especially strong where a parallel proceeding is ongoing in the originating country and there is a possibility that the award will be set aside since a court may be acting improvidently by enforcing the award prior to the completion of the foreign proceedings. (Emphasis added; citations omitted.) *See also, Europcar Italia S.p.A. v. Maiellano Tours, Inc.* (2d Cir. 1998), 156 F.3d 310, 317 (remanding to district court to reconsider decision not to adjourn); *Spier v. Calzaturificio Tecnica, S.p.A.* 663 F. Supp. 871, 874-75 (S.D.N.Y. 1987) (granting stay under Article VI of the New York Convention pending resolution of set aside action in Italian courts); *Fertilizer Corp. of India v. IDI Mgmt., Inc.* 517 F. Supp. 948, 962 (S.D. Ohio 1981) (adjourning confirmation action until Indian courts had completed review of arbitral award).

Similarly, this Court has the inherent authority to stay the present proceeding pending resolution of the Broadlink II arbitration. Furthermore, such a stay is appropriate to avoid inconsistent results because, as demonstrated below, Broadlink II will establish the amount of the offset to be applied to the Broadlink I award.

**2. Stay of Confirmation Is Appropriate Here Because the Award is not Complete Pending Resolution of Broadlink II**

As the First Circuit stated in *Hewlett-Packard*, a court retains "discretion to defer proceedings for prudential reasons," and a "typical reason is the pendency of a related proceeding in another tribunal." The power to stay is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Hewlett-Packard,* 61 F.3d at 105 (*citing Landis,* 299 U.S. at 254).

A stay is proper in this case simply in order to avoid duplicative judicial review and a premature entry of judgment.[8] It is also consistent with the factors that courts normally consider when granting injunctive relief. In the Ninth Circuit, a party seeking a stay must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of relief, that the balance of equities tip in his favor, and that a stay is in the public interest."[9] *Adobe Sys. v. Hoops Enter. LLC* 2012 U.S. Dist. LEXIS 34551, *3-4 (N.D. Cal. Mar. 14, 2012). The first two factors of this standard "are the most critical." *Nken v. Holder,* 556 U.S. 418, 129 S. Ct. 1749, 1761 (2009).

**a. Success on The Merits**

Dr. Najafi is extremely likely to win an offset in Broadlink II, and it is entirely possible that Injazat will ultimately owe more to Dr. Najafi than the other way around. As set forth

---

8 "A court may grant a stay in the furtherance of justice whenever it would be unjust to further execute or enforce the judgment, or where, although it is proper to enforce the judgment, there is good reason why execution should be postponed." *Ministry of Def. & Support v. Cubic Def. Sys., 665 F.3d 1091, 1100 (9th Cir. 2011)* (citing 33 C.J.S. (2011) Executions § 252).

9 An alternative to this standard is the "substantial questions" test, which requires the moving party to demonstrate "serious questions going to the merits," a "hardship balance that tips sharply towards the plaintiff," a "likelihood of irreparable injury." *Adobe Sys. V. Hoops Enter. LLC,* 2012 U.S. Dist. LEXIS 34551, *3-4 (N.D. Cal. March 14, 2012). *See also Alliance for the Wild Rockies v. Cottrell,* 622 F.3d 1045, 1053 (9th Cir. 2010). It is clear that Dr. Najafi has demonstrated both a strong likelihood of success on the merits, as well as raised serious questions about Injazat's performance under the SSA and SHA.

above (*see* section II.D.), Dr. Najafi has a variety of claims founded in contract and tort that are covered by his arbitration agreements with Injazat, totaling at least $2.5 million. *See* Najafi Decl. Ex. A at paras. 72-83. These claims are not barred by the relevant statute of limitations and Injazat is estopped from disputing the jurisdiction of the ICC to hear them.[10] The SHA and the SSA – which contain the relevant arbitration agreements – are governed by English law and, as under American common law, a party will be liable in damages for breaches of contract and tort.[11]

Injazat failed to make required payments or to take basic steps to ensure the financial viability of the company for which it was a majority shareholder. Dr. Najafi has pointed to no fewer than eight violations of the SSA and the SHA, each of which is supported by evidence showing a breach by Injazat. He has further provided evidence (much of which was proffered by witnesses during Broadlink I, so Injazat cannot claim to not know of these facts) of Injazat's breach of the Placement Agency Agreement; breach of promise; tortious interference with contract; and breach of fiduciary duty.

b. **If a Stay is Not Granted, Dr. Najafi Will Suffer Irreparable Harm**

As in *Hewlett-Packard* there is a "substantial prudential argument" in favor of granting this stay in light of the fact that Injazat as a fund is winding up. *See Hewlett-Packard,* 61 F.2d at 105. There is no doubt that the disputes at issue in Broadlink I and II are closely related. If in due course Dr. Najafi prevails on his claims against Injazat, which by then will be insolvent, he will be forced to seek enforcement in the jurisdictions where Injazat's successor funds have assets. In short, he would have "no assurance of collecting anything." *Id.* at 105.

In addition to the very real risk that Dr. Najafi will be unable to collect the award

---

[10] *See* Limitation Act 1980, ss. 2, 5 (avail. at http://www.legislation.gov.uk/ukpga/1980/58) (last visited March 30, 2012).

[11] *See, e.g., Supershield Ltd v Siemens Building Technologies FE Ltd* [2010] EWCA Civ 7 (recognizing that a contract breaker is ordinarily liable to the other party for damage resulting from his breach if it could have been anticipated at the time the contract was made); *OBG Ltd. v. Allan* [2008] 1 AC 1 (recognizing tort of inducing breach of contract); *Swindle and others v Harrison and another*, [1997] 4 All ER 705 (Judgment 3) (recognizing that liability for breach of fiduciary duty is "not dependent on proof of deceit or negligence.")

issued in Broadlink II, confirming the Broadlink I award now would have the wasteful result of requiring offsetting judgments to be judicially reviewed and enforced separately. This Court currently has jurisdiction to determine the amount of Broadlink I award that Injazat seeks to confirm. If it waits until the Broadlink II arbitration is complete, the Court will be able to take the value of Broadlink II into consideration and determine with finality how much Dr. Najafi owes Injazat. If this Court does not issue a stay, Dr. Najafi will be forced to pay Injazat the award in Broadlink I and then seek a refund in the amount determined in Broadlink II. *See, e.g.*, *Korea Wheel Corp*, 2005 U.S. Dist. LEXIS 40374 at *4-5 ("That JCA's claim and Korea Wheel's claim were split by the arbitrators need not result in a splitting of the relief afforded.") Further, the Federal Court system would have to decide multiple enforcement actions.

**c. Balance of Hardships Weighs in Favor of Dr. Najafi**

The harm that befalls Injazat if a stay is granted is minor in comparison to the harm that would be suffered by Dr. Najafi if the award were confirmed while the Broadlink II arbitration is pending. Injazat would very much prefer that the Broadlink I award is confirmed now, as confirmation would mean that Injazat will likely receive more money than it is entitled to. A stay merely means that Injazat does not receive a premature and necessarily incomplete victory. In other words, it cannot count its chickens before they hatch.

Dr. Najafi, on the other hand, has no guarantee of collecting the Broadlink II award since Injazat will have been wound up. If Broadlink I is prematurely confirmed, Dr. Najafi will be unable to recoup amounts paid under Broadlink I that are later offset by Broadlink II. As it is, Dr. Najafi will be forced to find a court willing to exercise jurisdiction over Injazat's assets in order to satisfy the amount of Broadlink II that is in excess of Broadlink I.

Dr. Najafi is understandably wary of seeking enforcement in Dubai courts, having been through the process of fighting legal hurdles created there by Injazat before. Especially in light of representations made by Injazat's representatives during the travel ban regarding their influence over the local judiciary (*see* Decl. of H. Najafi at para. 11), there is no reason to trust that Injazat will voluntarily comply with the Broadlink II award.

Finally, Injazat is a venture capital fund with $50 million in capitalization. Dr. Najafi is a private individual dependent on his wages. It will be extraordinarily unfair if Dr. Najafi is forced to pay money that the Broadlink II tribunal ultimately determines is not owed.

d. **Public Interest Favors the Issuance of a Stay**

The public interest analysis, which usually is considered in the context of issuing a preliminary injunction, requires a consideration of whether there exists "some critical public interest that would be injured by the grant of preliminary relief." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1114-15 (9th Cir. 2010) (internal quotations omitted).

Regarding this stay, public interest favors the avoidance of duplicative judicial review, and also favors entering judgment only once the amount of that judgment is determined with finality. At this point, as much as Injazat will protest to the contrary, it cannot claim that the Broadlink I award ***finally*** determines the liabilities in this case or the damages that will be owed. The full liabilities in the Broadlink saga will only be known with finality once Broadlink II is complete and the parties have had a chance to present all of their claims.

There is no risk of endless iterations of Broadlink-related arbitrations – Dr. Najafi is raising every claim available to him under contract and tort, claims that he did not raise in Broadlink I only because his defense was entirely based on contesting jurisdiction. Furthermore, Dr. Najafi cannot be faulted for failing to bring Broadlink II immediately after the Award was issued in late July 2011. He was prevented from bringing this arbitration (or indeed from even appearing in this action) at any time since August 18, 2011 because of the travel ban.[12]

12 To the extent that Injazat claims that Dr. Najafi had a lawyer in California that could have made an appearance in the enforcement action before January, it is simply wrong. Dr. Najafi is an individual who was practically bankrupted by the failure of Broadlink in 2007. He did not have the money to engage an attorney in California to address enforcement while he was focusing all of his financial resources on avoiding incarceration in Dubai and lifting the travel ban – two proceedings that were unjustified under Dubai law. Dr. Najafi had no assets in Dubai, thus there was no "risk" that he could avoid his debts in Dubai by leaving the country. Immediately after the travel ban was lifted, Dr. Najafi returned to his home state of California and has not challenged the jurisdiction of this court to confirm the Award. He has taken a minimal amount of time to investigate his claims in Broadlink II and engage arbitration counsel so that he could file a well-founded Request for Arbitration. He should not be faulted for being the victim of Injazat's abusive practices.

## IV. CONCLUSION

In sum, Dr. Najafi does not contest the right of this Court to recognize the Broadlink I award and does not seek for the Court to modify that award. Rather, he asks that the Court stay confirmation in consideration of the undisputable fact that his dispute with Injazat over two specific contracts will be incomplete while Broadlink II is pending before the ICC. As soon as Broadlink II is completed, it will be apparent how much of a setoff should be applied against the Broadlink I award. At that point, Injazat and Dr. Najafi can seek to confirm their awards in the courts of the United States or of any other signatory to the New York Convention, confident that neither party is being asked to pay more than is due under the SSA and the SHA.

Petitions to confirm arbitration awards are about enforcement. Injazat stands to lose a substantial portion of their award in Broadlink I once the Broadlink II award is issued; it is entirely plausible that they will end up owing Dr. Najafi money. To confirm Broadlink I now is to give Injazat a prematurely large judgment and to deny Dr. Najafi any means for satisfying any part of his award in Broadlink II because Injazat, which is now in the process of winding up, will no longer exist to pay its debts. Especially in light of Injazat's complicity in delaying Dr. Najafi's ability to bring Broadlink II by unjustly detaining him in Dubai for five months, Injazat should not be able to profit from its wrongdoing with a prematurely granted award for more money than it will be due. In light of these compelling reasons, coupled with the avoidance of duplicative judicial review and the protection of the parties' agreement to resolve their disputes in arbitration and not involve the courts until that process is complete, a stay is both prudent and just.

Dr. Najafi therefore respectfully requests that the Court stay Injazat's Petition to Confirm the Arbitration Award pending the resolution of Broadlink II.

Dated: March 30, 2012

Burke, Williams & Sorensen, LLP

By: /s/ Maria Alvarez for Douglas W. Dal Cielo

Douglas W. Dal Cielo
Attorneys for Defendant, Dr. Hamid Najafi